**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HILLTOP SPV, LLC** | § | **CASE NO. 24-60308-MMP** |
| | § | |
| | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

**SPOTSWOOD NATURAL RESOURCES, LLC'S RESPONSE TO MOTION TO
RECHARACTERIZE, EQUITABLY SUBORDINATE, AND OBJECTION TO THE
CLAIM OF SPOTSWOOD NATURAL RESOURCES, LLC**

Spotswood Natural Resources, LLC ("***Spotswood***") files this response to the *Motion to Recharacterize, Equitably Subordinate, and Objection to the Claim of Spotswood Natural Resources, LLC* [Doc. # 94] (the "***Motion***") filed by Monarch Midstream, LLC's ("***Monarch***"). For the reasons stated herein, the Motion should be denied, and Spotswood's proof of claim should be allowed in full. In support, Spotswood respectfully states as follows:[1]

## I.  SUMMARY OF ARGUMENT

The Motion should be denied, and Spotswood's proof of claim should be allowed in full. Spotswood acquired the loan from a non-insider third party. The Court's recharacterization analysis should focus on the enforceability of the loan at the time of inception pursuant to New York law, which enforces the plain and unambiguous terms of loan documents freely entered into by the parties. Even if the Court were to focus instead on the facts and circumstances surrounding the assignment of the loan to Spotswood and to apply Oklahoma law based on the post-assignment amendment of loan agreement, the recharacterization factors likely to be considered by an Oklahoma court weigh strongly against recharacterization. Moreover, Spotswood did not engage

---

[1] An index of the exhibits attached to this response is included after the certificate of service and before the start of the exhibits.

in the type of inequitable conduct that would warrant equitable subordination, nor did Spotswood's actions result in an unfair advantage or harm to other creditors.  Because the Motion should be denied and it is too late for any other party to challenge Spotswood's prepetition claim, the Court should allow Spotswood's proof of claim in full.

## II.   RESPONSES TO FACTUAL ALLEGATIONS IN THE MOTION

1.      Spotswood denies the allegations in ¶ 1.

2.      Spotswood denies the allegations in ¶ 2.

3.      With respect to ¶ 3, Spotswood denies that there was inequitable conduct and the factual allegations regarding Spotswood.  The ownership of Spotswood NR II was: (1) The John and Denise Redmond Living Trust (93.84%); (2) Doug Redmond (3.08%); and (3) C.B. Rowan (3.08%).  Spotswood admits that Spotswood NR II is and has always been the sole member of the Debtor, and that John Redmond was the Debtor's former manager.

4.      Spotswood admits that: the maturity date of its prepetition loan to the Debtor (absent prior acceleration) was in 2027; that it sent a notice of default on March 26, 2024; and that it sent a letter demanding payment of default interest on April 11, 2024.  Spotswood denies the remaining allegations in this paragraph.

5.      With respect to ¶ 5, Spotswood admits the first sentence and denies the remaining allegations.

6.      ¶ 6 contains legal argument that need not be admitted or denied.  To the extent that Monarch's argument is based on factual allegations, they are denied.

7.      ¶ 7 contains legal argument that need not be admitted or denied.  To the extent that Monarch's argument is based on factual allegations, they are denied.

8.      Spotswood admits the allegation in ¶ 8.

9.      Spotswood admits the allegations in ¶ 9, with one clarification.  John Redmond is a beneficial owner of Spotswood, but the membership units are owned by The John and Denise Redmond Living Trust, not John Redmond individually.

10.      Spotswood admits the allegations in ¶ 10.

11.      Spotswood admits that Spotswood NR II owns 100% of the Debtor, and denies that Spotswood is made up of the same members as Spotswood NR II.  Spotswood admits that Doug Redmond and C.B. Rowan are members of Spotswood and Spotswood NR II.  John Redmond is a beneficial owner of Spotswood through The John and Denise Redmond Living Trust.  Spotswood denies that the members and managers of Spotswood and Spotswood NR II are the same or nearly identical.

12.      Spotswood admits the factual allegations in ¶ 12.

13.      Spotswood admits the factual allegations in ¶ 13.

14.      Spotswood admits the factual allegations in ¶ 14.

15.      Spotswood admits the factual allegations in ¶ 15.

16.      Spotswood admits the factual allegations in ¶ 16.

17.      Spotswood admits the factual allegations in ¶ 17.

18.      Spotswood admits the factual allegations in ¶ 18.

19.      Spotswood responds to the timeline in ¶ 19 as follows:

| Date | Event | Response |
|------|-------|----------|
| 1/16/2009 | GGA with dedication to gatherer formed, and 5-year minimum volume period with initial gatherer. | Admit. |
| 2012 | Monarch takes over the GGA. | Admit. |
| 9/10/2020 | Debtor advised that GGA, as amended, includes minimum compression | Spotswood denies that John Redmond got the O&G |

|  | volume ("MVC") and compression fees are an annual commitment. *See* Exhibit B (email exchanges between John Redmond and former owner of the O&G Properties, Rivershore, detailing Debtor's obtaining the O&G Properties and becoming the successor-in-interest to the GGA. One email from John Redmond states the terms of the GGA do not matter because "we are getting for free [the O&G Properties]"). | properties for "free" and admits the remaining factual allegations. |
|---|---|---|
| 9/16/2020 | Debtor and Mr. Redmond acknowledge that the relevant assets remain distressed, even prior to the acquisition. | The document speaks for itself. |
| 9/29/2020 | Debtor obtains ownership of the O&G Properties (for "free") through assignment from Rivershore (an unaffiliated company), bill of sale, and conveyance; assumes and is bound by entire GGA, as amended. The Debtor is therefore the successor-in-interest to the GGA. | Denied. The Debtor received the Oil and Gas Properties from Hilltop Asset, LLC, and not for "free." Spotswood admits that the Debtor became successor-in-interest to the GGA. |
| 9/29/2020 | Debtor entered into an unsecured loan with Hilltop Asset, LLC, who assumed the $4 million promissory note liability owed to JPMorgan Chase ("Hilltop Asset Loan Documents"). | Spotswood admits that the Debtor entered into $4 million loan agreement with Hilltop Asset and denies the remaining allegations. |
| 9/29/2020 | Hilltop Asset, LLC assigned the Hilltop Asset Loan Documents to Hilltop Energy, LLC ("Hilltop Energy Assignment"). The Debtor and Hilltop Energy, LLC then executed a term note, dated September 29, 2020 ("Term Note") reflecting the Hilltop Energy Assignment (the Hilltop Energy Assignment and Term Note, collectively the "Term Loan Agreement"). | Admit. |
| 1/27/2021 | Debtor (Mr. Redmond) states that the collectability of the MVC is clearly questionable given Hilltop's balance sheet. | The document speaks for itself. |

| | | |
|---|---|---|
| 7/28/2021 | Hilltop Energy, LLC, whose sole member is J.P. Broker-Dealer Holdings Inc., assigned the Term Loan Agreement to Spotswood, executing an assumption and assignment of the prior $4 million JPMorgan unsecured note for $750,000 ("Spotswood Assignment"). Concurrently with the Spotswood Assignment, the Debtor and Spotswood executed a First Amendment to the Term Loan Agreement and that certain Security Agreement (as amended or modified and collectively, "Pre-Petition Loan Documents"), whereby Debtor paid $750,000.00 towards principal on the Term Note, for a remaining balance of $3,250,000.00 owed to Spotswood (the "Pre-Petition Loan"). See Proof of Claim No. 9-1.<br><br>To secure the obligations under the Pre-Petition Loan Documents, the Debtor executed the Security Agreement in favor of Spotswood, granting Spotswood a lien on substantially all of the Debtor's assets, including all accounts, deposit accounts, inventory and equipment, cash, and other rights to the payment of money or other monies due. See First Day Declaration, ¶¶ 16–17; Exhibit C. Through the Spotswood Assignment and amendments to the Pre-Petition Loan Documents, Spotswood became the pre-petition secured lender of the Debtor. | Admit. |
| 11/12/2021 | Monarch sends and Debtor receives MVC invoice for Year Six under the GGA for $311,144.25. This invoice was not paid. | Admit and add that in May 2021, Debtor paid for pre-acquisition and post-acquisition MCV payments in the amount of $262,420. |
| 11/21/2021 | Mortgage for First Amendment to the Term Loan Agreement and that certain Security Agreement recorded by Spotswood. | Admit. |
| 11/22/2021 | Debtor (through John Redmond) testifies that on this date, it had determined that it would not pay Monarch the MVC payment for Year Six | Admit and add that the reasoning behind the non-payment was due to further review of the amendment to the GGA and enforceability |

| | | of the MCV (1) in totality, and (2) if valid whether that was indeed an annual obligation. |
|---|---|---|
| 2021 | Debtor makes distribution of $2,500,000 to Spotswood NR. See Exhibit A, Response to Interrogatory No. 19. | Admit. |
| 2/22/2022 | UCC Statement Recorded by Spotswood, stating it has a lien on substantially all of the Debtor's assets | Admit. |
| 6/21/2022 | Monarch Files Arbitration for Year Six and Seven MVC fees (the "Arbitration"). | Admit. |
| 9/11/2023 | Arbitration award to Monarch on MVC for $756,374.40, plus the MVC Year Eight amount when it becomes due in November (the "Judgment") | Admit. |
| 3/5/2024 | Judgment issued for $1,137,684.36 as a result of Arbitration. | Admit. |
| 3/26/2024 | Notice of Default sent from Spotswood to Debtor due to Judgment. See Exhibit E. | Admit. |
| 4/4/2024 | Monarch records Abstract of Judgment recorded in Leon County (the "Judgment Lien"). | Admit. |
| 4/9/2024 | John Redmond steps down from management of Spotswood NR, and Erik White is appointed CRO. John Redmond maintains his position at Spotswood. | Admit. |
| 4/11/2024 | Spotswood accelerates Pre-Petition Loan and enforces 8% default interest rate. See Exhibit E. | Admit. |
| 6/3/2024 | Debtor files for bankruptcy. | Admit. |
| 6/4/2024 | Debtor files adversary proceeding to avoid Judgment Lien as a preference (the "Adversary Proceeding"). | Admit. |

20.     With respect to ¶ 20, Spotswood admits it obtained a security interest in substantially all of the Debtor's assets and denies that the Debtor received no additional consideration.

21.     With respect to ¶ 21, Spotswood admits to the Consent to Distribution term in the amendment to the loan agreement and denies that this was "bizarre."

22.     Spotswood admits the allegations in ¶ 22.

23.     With respect to ¶ 23, Spotswood admits that it sent a notice of default on March 26, 2024, and that the default interest rate is 8%.  Spotswood denies the remaining factual allegations in this paragraph.

24.     Spotswood admits the allegations in the first sentence of ¶ 24 and denies the remaining allegations in this paragraph.

25.     Spotswood denies any other allegations in the Motion not otherwise admitted above.

### III.     BACKGROUND

#### A.  *The Parties*

##### i.     Spotswood Natural Resources, LLC

26.     Spotswood Natural Resources, LLC ("***Spotswood***") was formed on January 1, 2020 for the purpose of acquiring and holding various oil and gas interests and other investments.[2] Spotswood has two classes of membership units: Series A Units and Series B Units.  The Series A Units are held by The John and Denise Redmond Living Trust (93.84%), Doug Redmond (3.08%), and C.B. Rowan (3.08%) (the "***Series A Members***").[3]  The Series A Units were issued and vested

---

[2] *See* **Exhibit 1**, which is a true and correct copy of the Operating Agreement of Spotswood Natural Resources, LLC dated January 1, 2020.
[3] *Id*. at Exhibit A.

immediately upon the formation of Spotswood in exchange for the Series A Members' initial capital contributions.[4]  The Series B Units are held by The John and Denise Redmond Living Trust (15%), Doug Redmond (15%), and C.B. Rowan (15%), Kyle D. Culhane (10%), Tamra Spence (5%), Denise Redmond (2.5%), William J. Eastman (9%), Kristi Perryman (6%), Billy H. McLaughlin (2.5%), James Cameron Dullea (10%), and Thomas King (10%) (the "***Series B Members***").[5]  The Series B Units are equity incentive units that were issued to certain employees of Spotswood.[6]  Although the Series B Units were also granted upon the formation of Spotswood, they did not vest until the Series A Members received distributions equal to their capital contributions multiplied by a factor of 1.2 (the "***Payout***").[7]  The Series B Units fully vested in the Series B Members when the Payout occurred in December 2021, which also satisfied all distribution rights held by the Series A Members on account of the Series A Units.  Once the Payout occurred, the Sharing Ratios of the members were adjusted such that all future distributions were made according to the Series B Members' respective ownership percentages of Series B Units.[8]  Spotswood is governed by a Board of Managers consisting of John Redmond, Doug Redmond, Denise Redmond, and C.B. Rowan.[9]

  ii. <u>Hilltop SPV, LLC</u>

27. Hilltop SPV, LLC (*i.e.*, the Debtor) was formed on September 16, 2020 for the purpose of acquiring and owning certain oil and gas properties (the "***Oil and Gas Properties***") in the "Hilltop Lakes" field located in Leon and Robertson Counties, Texas.[10]  The Debtor's sole

---

[4] *Id.* at 9-10, § 3.1.  (Throughout this response, references to page numbers refer to the internal pagination in the exhibits where applicable.)
[5] *Id*. at Exhibit A.
[6] *Id*. at 12-13, § 3.4.
[7] *Id*. at 7, 12-13, § 3.4(b).
[8] *Id*. at 8, 18, § 4.4(a).
[9] *Id*. at 18, § 5.1.
[10] *See* **Exhibit 2**, which is a true and correct copy of the Company Agreement of Hilltop SPV, LLC dated September 16, 2020.

member is Spotswood NR II, LLC.[11]  The Debtor was managed by John Redmond until April 9, 2024, when he resigned and Keith Curlee was appointed as manager.[12]

       iii.   <u>Spotswood NR II, LLC</u>

28.    Spotswood NR II, LLC was also formed on September 16, 2020.[13]  Its members consist of The John and Denise Redmond Living Trust (93.84%), Douglas E. Redmond (3.08%), and Charles B. Rowan (3.08%).[14]  John Redmond is the manager of Spotswood NR II.[15] Spotswood NR II's sole asset is its 100% membership interest in Hilltop SPV.

**B.  *The Oil and Gas Properties and the Inception of the Loan to the Debtor***

29.    On or about September 29, 2020, the Debtor purchased the Oil and Gas Properties from Hilltop Asset, LLC.[16]  The purchase was seller-financed by Hilltop Asset pursuant to a Term Loan Agreement (the "***Initial Loan Agreement***") under which the Debtor agreed to pay Hilltop Asset $4 million.[17]  The Initial Loan Agreement contemplated that Hilltop Asset would immediately assign its rights and obligations under the agreement to its lender, Hilltop Energy, LLC, to satisfy Hilltop Asset's own outstanding debt to Hilltop Energy.[18]  At the time of the purchase, the Oil and Gas Properties were subject to a lien securing a debt of approximately $4 million owed by Hilltop Asset to Hilltop Energy and Chase Lincoln First Commercial Corporation ("***Chase Lincoln***").[19]  Hilltop Asset, Hilltop Energy, and Chase Lincoln were all subsidiaries of

---

[11] **Exhibit 2** at 1, Schedule A.
[12] *Id*. at 10, § 6.01; **Exhibit 3**, which is a true and correct copy of the Combined Resolutions of the Manager and Sole Member of Hilltop SPV, LLC dated April 9, 2024.
[13] *See* **Exhibit 4**, which is the Operating Agreement of Spotswood NR II, LLC dated September 16, 2020.
[14] *Id*. at Exhibit 1.
[15] *Id*. at 10, § 6.01.
[16] *See* **Exhibits 5 and 6**, which are copies of the Assignment, Bill of Sale & Conveyance dated September 29, 2020 from Hilltop Asset to Debtor recorded in Leon and Robertson Counties, Texas.
[17] *See* **Exhibit 7**, which is the Term Loan Agreement dated September 29, 2020 executed by the Debtor, as borrower, and Hilltop Asset, as the "Initial Lender."
[18] *Id*. at 1.
[19] *See* **Exhibit 8**, which is the Release of Collateral dated September 29, 2020 executed by Hilltop Asset, as borrower, and Hilltop Energy and Chase Lincoln First Commercial Corporation, as lenders.

JPMorgan Chase Bank, NA.[20]   At the closing, Hilltop Asset assigned its rights, interests, and obligations under the Initial Loan Agreement to Hilltop Energy,[21] and Hilltop Energy and Chase Lincoln released their lien on the Oil and Gas Properties.[22]   To memorialize the debt to Hilltop Energy (as assignee of Hilltop Asset), the Debtor executed a Term Note (the "***Note***") to Hilltop Energy in the original principal amount of $4 million.[23]

30.     The Initial Loan Agreement required the Debtor to make quarterly interest payments at the rate of 6% per annum, and provided for default interest at the rate of 8% per annum.[24]   The Initial Loan Agreement provided that the Note would mature upon the earlier of September 29, 2027 (seven years after the Closing Date) or acceleration.[25]   Section 7.1 of the Initial Loan Agreement prohibited the Debtor from making any member distributions while the loan was outstanding.[26]   Section 6.4(a) of the Initial Loan Agreement required the Debtor to "perform all obligations under any contractual obligation to which the Borrower … is bound, or to which any of their properties is subject, except where the failure to perform would not reasonably be expected to have a Material Adverse Effect."[27]   The Initial Loan Agreement defined "Material Adverse Effect" as:

> … a material adverse effect on (a) the ability of the Borrower and its Subsidiaries to perform, or of the Lender to enforce, the obligations under the Loan Documents, (b) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries (taken as a whole) or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder.[28]

---

[20] *See id.* (executed by J.P. Morgan Broker-Dealer Holdings, Inc. as manager for Hilltop Energy).
[21] **Exhibit 9**, which is the Assignment and Assumption dated September 29, 2020 executed by Hilltop Asset, as Assignor, and Hilltop Energy, as Assignee.
[22] **Exhibit 8**.
[23] **Exhibit 10**, which is the Term Note dated September 29, 2020 executed by the Debtor, as Borrower, to Hilltop Energy, as lender and assignee of Hilltop Asset.
[24] **Exhibit 7** at 2, § 2.4.
[25] *Id*. at 1, § 2.1.
[26] *Id*. at 11-12, § 7.1.
[27] *Id*. at 10, § 6.4(a).
[28] *Id*. at Annex I-7.

Finally, section 9.1(d) of the Loan Agreement provides that it shall constitute an Event of Default if "the Borrower fails to observe or perform any covenant in any Loan Document … for fifteen (15) days after the earlier of (1) the date the Borrower becomes aware of the default or (2) written notice to the Borrower by the Lender specifying the default and demanding that such default be remedied and stating that such notice is a 'Notice of Default'."[29]

31.     In February 2021, Winter Storm Uri ("*Uri*") hit Texas. For a one-week period, natural gas prices rocketed up to more than $300/MCF, in comparison to the $2-3/MCF that had been normal.  Only certain gas was able to sell at this price, and the Debtor's marketing structure allowed it to capitalize on the higher prices.  Once production taxes, royalties, and operating expenses were paid, the Debtor was left with over $3.8 million in net income in February 2021.[30]

32.     Around July 2021 (approximately ten months after the Debtor's acquisition of the Oil and Gas Properties), Hilltop Energy decided to sell its rights under the Initial Loan Agreement and the Note.  Hilltop Energy approached John Redmond regarding a potential sale and, after some negotiation, expressed its willingness to assign the Hilltop SPV debt for $750,000.

33.     In considering how to structure the transaction, the Debtor's management consulted a tax partner at Grant Thornton, LLP regarding the potential tax consequences of the purchase of the loan.  Grant Thornton advised that, if the loan was purchased by the Debtor, the difference between the total amount of the outstanding debt and the purchase price would be create a large tax liability since it would be recognized as "debt forgiveness income."[31]  Grant Thornton suggested a strategy that would avoid the adverse tax consequences that involved purchase of the loan by Spotswood, keeping the debt in place without the adverse tax consequences.

---

[29] *Id*. at 18, § 9.1(d).
[30] **Exhibit 11**, which is the Debtor's Income Statement for 2021.
[31] *See* https://www.irs.gov/forms-pubs/about-publication-4681 (last visited Nov. 1, 2024).

34.     On July 28, 2021, Spotswood acquired all of Hilltop Energy's rights, interests, and obligations under the Initial Loan Agreement and the Note pursuant to an Assignment and Assumption Agreement (the "***Spotswood Assignment***") between Hilltop Energy and Spotswood.[32] As consideration for the Spotswood Assignment, Spotswood paid Hilltop Energy $750,000.[33]

35.     At the time, gas prices were trending upward, and the Debtor's financial outlook was positive.[34] A valuation of the Oil and Gas Properties as of July 1, 2021 prepared by the Debtor showed a value of $4.9 million.[35] Moreover, the Debtor was flush with cash from Uri, with over $3.75 million in the bank.[36] That said, because the Debtor and Spotswood NR II were pass-through entities for tax purposes,[37] the members of Spotswood NR II were facing a massive tax liability for 2021 based on the windfall from Uri.[38] And under the Initial Loan Agreement, the Debtor was prohibited from making member distributions (even to pay Spotswood NR II's taxes on the Debtor's income), which would have imposed a crushing tax burden for "phantom" income on Spotswood NR II's members.[39]

36.     To ensure that the members of Spotswood NR II had sufficient funds to pay the pass-through taxes and that Spotswood (8 of the 11 members of which were *not* members of Spotswood NR II) received consideration in return for the allowing the member distribution, Spotswood entered into a Letter Agreement concurrently with the execution of the Spotswood Assignment.[40] In the Letter Agreement, the Debtor agreed to make a partial prepayment of

---

[32] **Exhibit 12**, which is the Assignment and Assumption Agreement dated July 28, 2021 between Hilltop Energy, as lender and assignor, to Spotswood, as assignee.

[33] *Id*. at 2, § 3.

[34] **Exhibit 13**, which is a summary of the gas prices received by the Debtor per month from September 2020 to September 2024.

[35] **Exhibit 14**, which the Debtor's PV-10 Valuation dated July 1, 2021.

[36] **Exhibit 15**, which are bank statements for the Debtor's deposit accounts as of June 30, 2021.

[37] **Exhibit 2** at 8, § 5.07(a); **Exhibit 3** at 9, § 5.07(a).

[38] **Exhibit 16**, which is the Schedule K-1 issued by the Debtor to Spotswood for 2021.

[39] **Exhibit 7** at 11-12, § 7.1.

[40] *See* **Exhibit 17**, which is the Letter Agreement dated July 28, 2021 between Spotswood and the Debtor.

principal on the loan in the amount of $750,000.00 (the "***Partial Prepayment***") and to grant Spotswood a security interest in the Oil and Gas Properties to secure the loan.[41]   In exchange, Spotswood agreed to defer the payment of accrued interest that was otherwise due and payable in connection with the Partial Prepayment under section 5.2 of the Initial Loan Agreement,[42] and to allow the Debtor to make a one-time distribution to its members that was otherwise prohibited under section 7.1 of the Initial Loan Agreement.[43]

37.     Pursuant to the Letter Agreement, Spotswood and the Debtor executed the First Amendment to Term Loan Agreement (the "***Loan Agreement Amendment***" and, together with the Initial Loan Agreement, the "***Loan Agreement***") on July 28, 2021.[44]  The Debtor also granted Spotswood a lien on the Oil and Gas Properties pursuant to the Pledge, Security Agreement and Assignment dated July 28, 2021 (the "***Security Agreement***")[45] and the Deed of Trust, Security Agreement, Financing Statement and Assignment of Production, and Fixture Filing (the "***Deed of Trust***") dated July 28, 2021 and recorded as Document No. 2021-00447111 in the Official Records of Leon County, Texas and as Document No. 20213959 in the Official Records of Robertson County, Texas.[46]  To further perfect its lien, Spotswood filed a UCC financing statement with the Texas Secretary of State.[47]

38.     In September and December 2021, the Debtor made two distributions totaling $2.5 million to Spotswood NR II to cover pass-through tax liability and return on investment.[48]  At the end of 2021, the Debtor still had $734,340.54 in cash and revenue receivables, its assets were

---

[41] *Id*.

[42] **Exhibit 7** at 7, § 5.2.

[43] *Id*. at 11-12, § 7.1.

[44] **Exhibit 18**, which is the Loan Agreement Amendment between the Debtor and Spotswood dated July 28, 2021.

[45] **Exhibit 19**, which is the Security Agreement between the Debtor and Spotswood dated July 28, 2021.

[46] **Exhibits 20 and 21**, which are copies of the Deed of Trust between the Debtor and Spotswood dated July 28, 2021 recorded in Leon and Robertson Counties.

[47] **Exhibit 22** is the UCC-1 financing statement filed by Spotswood with the Texas Secretary of State.

[48] **Exhibit 13** at 1.

performing well, and gas prices were up.[49]

### C. The Workover Program in 2022

39.      The Debtor continued to accumulate cash over the next year, and, by the end of November 2022, had over $1.75 million in its accounts.[50]  The Debtor's management believed that gas prices would increase in the winter months, and, with the robust cash flow and cash reserves that had accumulated, moved to begin a workover program to fix some wells in need of repair.  In total, three workovers were identified, with a total estimated cost at the outset of $670,000.  Work began in September 2022.  The workover on the first well was completed and successfully increased production.  However, the costs associated with this well exceeded budget by almost $118,000.  The Debtor also performed coiled tubing cleanouts on two other wells, but those efforts were unsuccessful and neither of these wells were returned to production.  In total, the Debtor spent about $1.75 million on the workover program with little to show for it.[51]

40.      To make matters worse, gas prices declined unexpectedly and precipitously from over $7.27/MCF in August 2022 to under $1.47/MCF in February 2023, where they have hovered ever since.[52]  Due to the depletion of its cash reserves on the unsuccessful workover program and the steep drop in revenues from low gas prices, the Debtor now faced a liquidity problem.  To pay vendors and allow continued operations, the Debtor obtained an unsecured loan from JND Opportunities, LLC, which is owned by John Redmond and Denise Redmond, in the amount of $750,000.[53]

### D. The Gas Gathering Agreement and the Monarch Judgment

---

[49] **Exhibit 24**, which is the Debtor's year-end Balance Sheet as of December 31, 2021; **Exhibit 13**.
[50] **Exhibit 25**, which are the bank statements from Debtor's deposit accounts as of November 30, 2022.
[51] **Exhibit 26**, which is the Debtor's 2022 Income Statement.
[52] **Exhibit 13**.
[53] **Exhibit 27**, which is the Subordinated Promissory Note dated April 1, 2023 made by the Debtor to JND Opportunities.

41.     The onerous provisions in the Debtor's Gas Gathering Agreement with Monarch further compounded the Debtor's financial problems.[54]

42.     In 2009, the Debtor's predecessor-in-interest, as operator, entered into the Gas Gathering Agreement with Monarch's predecessor-in-interest, as gatherer.[55] In 2015, the Gas Gathering Agreement was amended to, among other things, require the Debtor to pay certain compression fees and to deliver a minimum of 10,000 MCF/day (the Minimum Compression Volume or "*MCV*") of gas.[56] In 2020, the Gas Gathering Agreement was amended a second time to increase the compression fees and extend the term of the agreement through 2034.[57]

43.     Unfortunately for both the Debtor and Monarch, the Debtor was never able to produce enough gas from the Oil and Gas Properties to meet the MCV, even after spending approximately $1.75 million on the unsuccessful workover program in an effort to do just that.

44.     As the next annual MCV payment was coming due in November 2021, the Debtor's management began to question Monarch's interpretation of the Gas Gathering Agreement and the enforceability of the penalty Monarch was claiming for failure to meet the MCV requirement. Upon the advice of counsel, the Debtor concluded that it was not enforceable and so refused to pay the MCV penalty, although the Debtor did continue paying gathering fees and compression fees under the Gas Gathering Agreement. Monarch eventually initiated the arbitration proceedings styled *Monarch Midstream, LLC v. Hilltop SPV, LLC*, Case No. 01-22-0002-3424 before the American Arbitration Association (the "*AAA*") seeking to enforce the MCV requirement.

45.     On September 11, 2023, a panel of three arbitrators (the "*Panel*") issued an award

---

[54] **Exhibits 28-30**, which are the Gas Gathering Agreement dated November 9, 2009, the Amendment to Gas Gathering Agreement dated June 26, 2015, and the Amendment No. 2 to Gas Gathering Agreement dated November 1, 2019.
[55] **Exhibit 28**.
[56] **Exhibit 29**.
[57] **Exhibit 30**.

in the amount of $675,012.75 (the "**Initial Award**") against the Debtor, with one arbitrator dissenting.[58] In the Initial Award, the Panel concluded that the Debtor had breached the Gas Gathering Agreement by failing to deliver the MCV from November 1, 2020, through October 31, 2022.[59] The Panel also concluded that the Debtor's failure to deliver the MCV in the future would constitute a breach of the Gas Gathering Agreement.[60] On September 20, 2023, the Panel issued its Supplemental Award on Interest and Reimbursement of AAA Administrative Fees and Expenses (the "**Supplemental Award**," and, together with the Initial Award, the "**Award**"), in which the Panel awarded Monarch an additional $75,199.45 in interest through September 11, 2023, plus $6,162.50 for reimbursement of the Debtor's share of the AAA fees and expenses.[61]

46.     Monarch subsequently filed suit to confirm the Award in the case styled *Monarch Midstream, LLC v. Hilltop SPV, LLC*, Cause No. 202368851 in the 11th District Court of Harris County, Texas (the "**State Court**").  In addition to the damages awarded in the Award, Monarch requested that the judgment include additional damages resulting from Hilltop's failure to deliver the MCV from November 1, 2022 to October 31, 2023.  On March 5, 2024, the State Court confirmed the Award and granted Monarch's request for additional damages in its Final Judgment Confirming Arbitration Award (the "**Judgment**"), which awarded Monarch damages totaling $1,137,684.36, plus Monarch's costs and disbursements in bringing in the lawsuit to confirm the Award.[62]

47.     After entry of the Judgment, it became clear that the Debtor had exhausted its legal defenses to the MCV and did not have the ability to pay either the Judgment or the MCV fees that

---

[58] **Exhibit 31**, which is the Initial Award.
[59] *Id*. at 10-12.
[60] *Id*. at 12.
[61] **Exhibit 32**, which is the Supplemental Award.
[62] **Exhibit 33**, which is the Final Judgment.

would continue to accrue in the future.[63]  Consequently, on March 26, 2024, Spotswood sent the Debtor a Notice of Default based on the entry of the Final Judgment and the Debtor's breach of section 6.4(a) of the Loan Agreement, which required the Debtor to pay its contractual obligations when due.[64]  When the Debtor failed to cure the default, Spotswood sent the Debtor a Notice of Acceleration on April 11, 2024, thereby declaring all unpaid principal, interest, and other amounts owed under the Loan Agreement and the Note immediately due and payable.[65]  The Debtor has not paid any amounts due to Spotswood since acceleration.

### E.  The Bankruptcy

48.    After entry of the Judgment, it became apparent that the Debtor could not successfully operate with the Gas Gathering Agreement, and particularly the MCV provision, in place.  In effect, the Debtor would be operating the wells at a loss solely for the benefit of Monarch and other service providers.

49.    On June 3, 2024 (the "***Petition Date***"), the Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code and elected to proceed under Subchapter V of the Bankruptcy Code.  The Debtor continues to operate and manage its financial affairs and operations as debtor in possession.

50.    On July 12, 2024, this Court entered the *Agreed Final Order Authorizing the Debtor to Obtain Postpetition Financing and (II) Granting (a) Adequate Protection to Prepetition Secured Party and (B) Related Relief* (the "***DIP Order***") [Doc. # 60] approving the final DIP Loan Agreement,[66] which gives Spotswood, as DIP Lender, a valid, enforceable, non-avoidable, and fully perfected security interest in and liens upon all Collateral (as defined in the DIP Loan

---

[63] **Exhibit 34**, which are the bank statements for the Debtor's deposit accounts as of March 31, 2024.
[64] **Exhibit 35**, which is the Notice of Default.
[65] **Exhibit 36**, which is the Notice of Acceleration.
[66] As defined in the DIP Order.

Agreement) to secure the DIP Loan.

51.     On August 12, 2024, Spotswood filed its proof of claim in the amount of $3,989,132.09, $3,414,900.00 of which it asserts as secured and $494,232.09 of which it asserts as unsecured.  [Claim # 9].

52.     On September 12, 2024, Monarch filed the Motion.

## IV.     ARGUMENT

### A.  *Recharacterization*

    i.     <u>Standard for Recharacterization in the Fifth Circuit</u>

53.     Spotswood's claim is a debt and should not recharacterized as an equity contribution.

54.     Recharacterization involves the determination of "whether a debt actually exists." *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001).  Thus, "[t]he debt-versus-equity inquiry is not an exercise in recharacterizing a claim, but of characterizing the advance's true character."  *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citations omitted).  The question is "whether the transaction created a debt or equity relationship from the outset….  The court must focus its inquiry to a point *at the very beginning* of the parties' relationship."  *Id.* (emphasis added); *see also AutoStyle*, 269 F.3d at 747-48 ("Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*.") (internal citations omitted); *In re HH Liquidation, LLC*, 590 B.R. 211, 290 (Bankr. D. Del. 2018); *In re Estill Med. Techs.*, Case No. 01-48064-DML-11, 2003 WL 27356581, at *3 (Bankr. N.D. Tex. Sept. 12, 2003) ("Recharacterization of debt as equity is where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ] ab initio.'") (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D.

Va. 1997)).

55.     There is a split among the circuits on the source of a bankruptcy court's authority to recharacterize a debt as an equity contribution. *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 543 (5th Cir. 2011). Several circuits—including the Third, Fourth, Sixth, and Tenth Circuits—have held that the authority to recharacterize a debt as equity stems from the bankruptcy court's equitable powers under 11 U.S.C. § 105(a). *Id.* (citing *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 n. 6 (3d Cir. 2006); *In re Dornier Aviation, Inc.*, 453 F.3d 225 (4th Cir. 2006); *In re Hedged–Invs. Assocs.*, 380 F.3d 1292 (10th Cir. 2004); and *AutoStyle Plastics*, 269 F.3d at 748–49). Those courts apply various multi-factor tests adopted from federal tax cases to consider whether an advance of funds, though labeled by the parties to the transaction as a loan, was in fact an equity contribution. *See id.*[67] Because these cases involve an interpretation of section 105(a), they are based on federal common law interpreting this provision of the Bankruptcy Code. *See id.*

56.     In contrast, the Fifth Circuit has rejected this approach and held that the power to recharacterize a debt as an equity contribution arises from the bankruptcy court's authority to adjudicate claims under 11 U.S.C. § 502(b), not section 105(a). *Lothian Oil*, 650 F.3d at 542. Section 502(b) requires the court to allow a claim unless it "is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b). Under the United States Supreme Court's seminal decision in *Butner*, the "applicable law" governing a parties' rights against the estate under section 502(b)—and by extension this Court's

---

[67] Other circuits have followed yet different approaches. *See In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 849-851 (Bankr. N.D. Tex 2013). The Eleventh Circuit has applied "an amazingly broad, alternative two-prong test." *Id.* at 848-49 (citing *Estes v. N & D Props., Inc. (In re N & D Props., Inc.)*, 799 F.2d 726, 733 (11th Cir. 1986)). The Ninth Circuit has rejected the concept of recharacterization altogether and held that bankruptcy courts lack the power to recharacterize loans as equity contributions. *Id.* at 849; (citing *Unsecured Creditors' Comms. of Pac. Express, Inc. v. Pioneer Commercial Funding Corp. (In re Pac. Express, Inc.)*, 69 B.R. 112, 115 (9th Cir. BAP 1986)); *see also Lothian Oil*, 650 F. 3d at 543 (same).

recharacterization analysis—is the state law under which the claim arises. *Lothian Oil*, 650 F.3d at 543 (citing *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.")); *In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 852 (Bankr. N.D. Tex 2013) (after acknowledging multi-factor tests used in other circuits, applying Massachusetts law to recharacterization analysis under section 502(b)); *In re Am. Housing Found.*, 499 B.R. 517, 535-36 (Bankr. N.D. Tex. 2013) (applying Texas law to recharacterization analysis under 502(b)); *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 706-08 (Bankr. W.D. Tex. 2012) (same).

57.     After concluding that applicable state law governed its recharacterization analysis, the *Lothian Oil* court went on to apply the multi-factor test "imported" from federal tax law by Texas courts. 650 F.3d at 539 (citing *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n. 3 (Tex. App.—Austin 1997, no pet.); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3rd Cir. 1968); *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); and *Jones v. United States*, 659 F.2d 618, 622 n.12 (5th Cir. 1981)). Thus, although the *Lothian Oil* court ultimately arrived at the same standard as that applied in most other circuits, it got there through the application of state law under section 502(b) rather than federal common law interpreting section 105(a). 650 F.3d at 544; *Equip. Equity*, 491 B.R. at 852 (observing that "to the extent that Texas law would apply in the case at bar, the factor test condoned by the Fifth Circuit is essentially the same as the factor tests articulated in the Third, Fourth, Sixth, and Tenth Circuits").

ii.     The loan is a valid, enforceable debt under New York law.

58.     When considering whether Spotswood's loan should be recharacterized as an equity contribution to the Debtor, this Court must apply New York law, which was the "applicable law" at the time that the loan was created. As an assignee, Spotswood stands in the shoes of Hilltop

Energy and took any and all rights it had under the loan documents executed by the Debtor. The Fifth Circuit has recognized that "an assignee takes all of the rights of the assignor, no greater and no less." *FDIC v. McFarland,* 243 F.3d 876, 887 n. 42 (5th Cir. 2001) (citations omitted). "In other words, 'an assignee ... stands in the same position as its assignor stood.'" *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (citing *Houk v. Comm'r,* 173 F.2d 821, 825 (5th Cir.1949)).

59.     In its recharacterization analysis, the Court must focus on the facts and circumstances that existed at the inception of the loan to determine whether the loan was, in substance, an equity contribution *ab initio*. *AutoStyle*, 269 F.3d at 747-48; *State St. Bank & Trust*, 520 B.R. at 74; *HH Liquidation, LLC*, 590 B.R. at 290; *Estill Med. Techs.*, 2003 WL 27356581, at *3. Here, the Initial Loan Agreement and the Note establishing the debt were governed by New York law.[68] The Note was never amended and is still governed by New York law.[69] And although the Loan Agreement Amendment later changed the choice of law in the Loan Agreement to Oklahoma law, that amendment did not occur until nearly a year after the loan was issued.[70] "… [R]ights or obligations that may have vested or accrued under previous versions of a contract can only be modified or extinguished through the inclusion of express language that manifests such intent." *Millenium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 342 (5th Cir. 2004) (applying Texas law); *see also Mahalxmi Hospitality, LLC v. Steadfast Ins. Co.*, 577 F. Supp. 3d 1232, 1242-43 (N.D. Okla. 2021) (under Oklahoma law, contract modification applied only prospectively where parties did not explicitly agree otherwise). The Loan Agreement Amendment did not provide that Oklahoma law would apply retroactively to the Initial Loan

---

[68] **Exhibit 7** at 21, § 10.7; **Exhibit 10**.

[69] *See id.*

[70] **Exhibit 18** at 3, §§ 6 and 9.

Agreement.[71]  Thus, the Court must examine the transaction between the Debtor and the original

lenders—Hilltop Asset and its assignee Hilltop Energy—that occurred in September 2021 pursuant

to New York law.  If that transaction created a debt, then Spotswood purchased a debt by virtue of

the Spotswood Assignment.  There is simply no basis or legal authority for recharacterizing what

was clearly a loan at the outset as an equity contribution simply because the loan was later

purchased by an insider of the borrower.

60.     The *In re LATAM Airlines Group S.A.* decision recently issued by the United States

Bankruptcy Court for the Southern District of New York provides a useful framework for the

Court's recharacterization analysis in this case.  *See In re LATAM Airlines Group S.A.*, Case No.

20-11254 (JLG), 2022 WL 1295928 (Bankr. S.D.N.Y. Apr. 29, 2022).  There, the court applied

New York law to determine whether the loans at issue constituted enforceable debts against the

estate under section 502(b)(1).  *LATAM Airlines*, 2022 WL 1295928, at *11-14.  Unlike other

states like Texas, New York has *not* adopted a multi-factor recharacterization test from federal tax

law.  *Id.* at *12 ("… [T]he Court is unaware of any New York state court that has applied the

*AutoStyle* factors in assessing the 'true character' of a purported loan agreement and finds no

grounds for doing so.").  Consequently, the court found "no merit to the Committee's assertion

that … it should look behind the plain language of the agreements and undertake an analysis of

the 'true character' of the agreements akin to that conducted by courts applying the *AutoStyle*

factors in determining whether to recharacterize debt as equity."  *Id.*

61.     Under New York law, an unambiguous agreement will be enforced as written, and

parol evidence is generally not admissible to alter the terms explicitly agreed to by the parties:

> Under New York law, "a written agreement that is complete, clear and
> unambiguous on its face must be enforced according to the plain meaning of its
> terms." *Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 556

---

[71] *Id* at 2-3, § 5.

(S.D.N.Y. 2009), *aff'd*, 607 F.3d 905 (2d Cir. 2010) (citing *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (Ct. App. 2002)); s*ee also Marin v. Constitution Realty, LLC*, 28 N.Y.3d 666, 673 (Ct. App. 2017) ("A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (internal citation omitted). Absent exigent circumstances such as fraud, duress, undue influence or mutual mistake, New York courts preclude a party from offering evidence to contradict or modify an unambiguous contract. *See, e.g., Polygram Holding, Inc. v. Cafaro*, 42 A.D.3d 339, 340 (1st Dept 2007); *see also* 6 Corbin on Contracts § 25.21 (2021) (recognizing that extrinsic evidence is only admissible to prove a claim of mistake or fraud and identifying lack of consideration, fraud, duress, undue influence, or illegality as circumstances in which evidence may be offered to contradict or modify a contract).

*Id*. at *11.

62.     With respect to loan agreements specifically, "'[a] loan is a contract whereby one party advances monies to the other upon a promise to repay at a future time a sum equivalent to that which was transferred, with or without interest.'" *Id*. at *13 (citing *People v. Grasso*, 13 Misc. 3d 1227(A), 2006 N.Y. Slip Op. 52019(U), *21 (Sup. Ct., New York County 2006), *aff'd as mod on other grounds [in] People v. Grasso*, 54 A.D.3d 180 (1st Dept 2008); *Merch. Cash & Capital, LLC v Yehowa Med. Servs., Inc.*, No. 602039-16, 2016 WL 4478805, at *5 (Sup. Ct., Nassau County July 29, 2016) ("The essence of a loan or forbearance is a lender's absolute right to repayment")).  "…[N]either an interest rate, a payment schedule, or even a formal written agreement is necessary to enforce a debt obligation under New York law." *Id.* at *3 (citing *Grasso*, 2006 N.Y. Slip Op. 52019(U), *21).  Finally, whether the transaction was "arms-length" is irrelevant, as "[c]ourts applying New York law regularly enforce loans negotiated between 'arm-in-arm' or related parties containing terms otherwise unavailable from commercial lenders." *Id.* at *14 (citing *J.D. v. A.D.*, 54 Misc.3d 1221(A), 2017 N.Y. Slip Op. 50261(U), *6 (Sup. Ct., Richmond County 2017); and *Stein v. Anderson*, 123 A.D.3d 1322, 1322 (3d Dept. 2014)).

63.     Under New York law, it is clear that the loan documents executed by the Debtor, Hilltop Asset, and Hilltop Energy created a valid, enforceable debt.  The Initial Loan Agreement

between the Debtor and Hilltop Asset is a comprehensive and sophisticated loan agreement spanning 45 single-spaced pages with annexes and exhibits.[72] Likewise, the Note executed by the Debtor following Hilltop Asset's assignment of the Initial Loan Agreement to Hilltop Energy is a valid promissory note memorializing the Debtor's obligation to repay the loan initially extended by Hilltop Asset and assigned to Hilltop Energy.[73] The Initial Loan Agreement and the Note clearly and unambiguously establish the Debtor's obligation to pay a debt. The rights later purchased by Spotswood are and always have been a valid and enforceable debt under New York law.

64.     If the Note and Initial Loan Agreement were still held by Hilltop Energy, there is simply no universe in which this Court would ever consider construing the underlying loan as an equity investment in the Debtor. For the purposes of recharacterization, the Court must focus on the character of the transaction at the time that the credit was extended. The fact that Spotswood subsequently purchased the debt from Hilltop Energy does not magically transform what was clearly a loan into an equity investment as a consequence of the Spotswood Assignment. As an assignee, for better or worse, Spotswood took whatever rights its assignor Hilltop Energy possessed. The fact that there was overlap between the beneficial owners of Spotswood and the Debtor is irrelevant. Under New York law, Hilltop Asset and its assignee Hilltop Energy held a valid and enforceable debt against the Debtor. So too does Spotswood today under section 502(b)(1).

   iii. <u>Even if the Court were to apply Oklahoma law and the Tenth Circuit's multi-factor test, the balance of the factors weighs against recharacterization.</u>

65.     For the reasons stated above, Monarch's Motion analyzes the wrong transaction (*i.e.*, the Spotswood Assignment rather than the initial loan from Hilltop Asset and Hilltop Energy)

---

[72] **Exhibit 7**.
[73] **Exhibit 10**.

at the wrong time (*i.e.*, July 2021 rather than September 2020) under the wrong law (*i.e.*, Oklahoma law rather than New York law).  Application of the recharacterization doctrine presupposes that there has been an advance from the claimant to the debtor.  *See In re Georgetown Bldg. Assocs., Ltd. P'ship*, 240 B.R. 124, 137 (Bankr. D.D.C. 1999) ("The debt-versus-equity inquiry is not an exercise in recharacterizing a claim, but of characterizing the advance's true character.").  The key question is whether that capital infusion, though designated as a loan by the parties, was in actuality an equity investment.  *In this case, Spotswood did not give the loan at issue to the Debtor; it merely purchased an existing loan from Hilltop Energy*.  Thus, there was no advance made by an insider of the Debtor that is subject to recharacterization as equity.  The only question is what rights the original lenders (Hilltop Asset and Hilltop Energy) had that were subsequently assigned to Spotswood.  Accordingly, the facts and circumstances surrounding the loan and the relationship between the Debtor and Spotswood at the time of the Spotswood Assignment in July 2021 are irrelevant.

66.     In the unlikely event that the Court does choose to consider recharacterizing the loan at the time of the Spotswood Assignment and to apply the Oklahoma choice of law provision in the Loan Agreement Amendment, the relevant factors still do not support treatment of the loan acquired by Spotswood as equity.  In the Motion, Monarch cites to an Oklahoma bankruptcy court opinion applying the multi-factor recharacterization test adopted by the Tenth Circuit.  *See Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 365 (Bankr. E.D. Okla. 2010) (citing *In re Hedged–Invs. Assocs., Inc.*, 380 F.3d 1292, 1298 (10th Cir. 2004)).  Under *Lothian Oil*, the applicable standard is governed by Oklahoma law, not the federal common law applicable in the Tenth Circuit and binding on the *Lexington Oil* court.  *See* 650 F.3d at 543-44.  That said, at least one Oklahoma state district court has adopted the *Hedged-Investments* multi-factor test under

Oklahoma law. *See Okla. Dep't of Sec. v. Seabrooke Invs., LLC*, No. CJ20144515, 2015 WL 13684811, at *3 (Okla. Dist. Aug. 21, 2015) (citing *Hedged–Invs.* and *Lexington Oil*). Of course, one trial court's opinion is not binding on any other Oklahoma court, and undersigned counsel has not located any Oklahoma appellate court decision addressing this issue.

67.     Nevertheless, assuming *arguendo* that Oklahoma courts would apply the multi-factor test employed by the Tenth Circuit in *Hedged-Investments* to "distinguish true debt from camouflaged equity," those factors are:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between the creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

380 F.3d at 1298. No one factor is determinative, and the importance of any one of them may vary depending on the circumstances. *Id*.

68.     Here, the Loan Agreement Amendment modified the choice of law in the Initial

Loan Agreement—and that agreement only—to Oklahoma.[74]  It did not, however, modify the New York choice of law in the Note, which was not amended in the Loan Agreement Amendment.[75]  Thus, even in the hands of Spotswood, the Note remains governed by New York law.  For this reason alone and under the analysis above, the Note remains enforceable as a free-standing, enforceable negotiable instrument in the hands of Spotswood.  At best, then, the *Hedged-Investments* factors may only be applied to Spotswood's rights under the Loan Agreement.

    iv.    Application of the *Hedged-Investments* factors.

69.    Although Spotswood disagrees that the *Hedged-Investments* factors are applicable here, it will apply each in turn to the loan documents as they existed at in July 2021 at the time of the Spotswood Assignment:

    **1)   The name given to the certificates evidencing the indebtedness.**

70.    The loan from Hilltop Asset, the assignment to Hilltop Energy, the assignment to Spotswood, and the subsequent amendments to the loan were all properly documented through the Initial Loan Agreement, the Note, the Loan Agreement Amendment, the Security Agreement, the Deed of Trust, and the assignments.[76]  *See Hedged-Invs.*, 380 F.3d at 1292 ("the transaction documents drafted by the parties treat the funds as a loan and fulfill the proper formalities for a commercial loan").  This factor weighs against recharacterization.

    **2)   The presence or absence of a fixed maturity date.**

71.    The presence of a fixed maturity date indicates the existence of a loan.  *AutoStyle*, 269 F.3d at 750.  Pursuant to section 2.1 of the Initial Loan Agreement, the loan has had a fixed maturity date since inception, which was not modified in the Loan Agreement Amendment.[77]  This

---

[74] **Exhibit 7**.
[75] **Exhibit 18**.
[76] *See* **Exhibits 7, 9, 10, 12, 18-21**.
[77] *See* **Exhibit 7** at 1, § 2.1.

factor weighs against recharacterization.

### 3) *The source of payments.*

72.     "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *AutoStyle*, 269 F.3d at 751. Where the source of repayment is the borrower's revenues, this weighs "slightly in favor of equity"; however, this is offset where the lender has a lien on the borrower's assets. *Id.* Here, the source of repayments is revenues from the Oil and Gas Properties. However, pursuant to the Security Agreement and the Deed of Trust, repayment of the loan is also secured by a lien on the Oil and Gas Properties.[78] This factor is either neutral or weighs against recharacterization.

### 4) *The right to enforce payment of principal and interest.*

73.     Spotswood has the right to enforce payment of principal and interest.[79] In addition to the right of acceleration, Spotswood has the right to enforce its lien on the Oil and Gas Properties.[80] This factor weighs against recharacterization.

### 5) *Participation in management flowing as a result.*

74.     The key question for this factor is whether the lender "acquired … management control in exchange for its funds." *Hedged-Invs.*, 380 F.3d at 1299. Here, John Redmond was already the Debtor's manager prior to the Spotswood Assignment.[81] Thus, Spotswood did not acquire any new management rights as a consequence of the assignment. This factor weighs against recharacterization.

### 6) *The status of the contribution in relation to regular corporate creditors.*

75.     Subordination of advances to claims of all other creditors indicates that the

---

[78] **Exhibits 19-22**.
[79] **Exhibit 7** at 1-2; **Exhibit 10**.
[80] **Exhibits 19-21**.
[81] **Exhibit 2** at 10, § 6.01.

advances were capital contributions rather than true loans. *AutoStyle*, 269 F.3d at 752. Spotswood did not agree to subordinate its claims to other Hilltop creditors and, in fact, took the senior lien position. This factor weighs against recharacterization.

### 7) *Intent of the Parties*

76. The determinative inquiry in classifying claims as debt or equity is the intent of the parties at the time of the transaction. *Submicron*, 432 F.3d at 457; *Mixon*, 464 F.2d at 407 ("the parties' intent to create either a debt or equity relationship is, in a sense, the ultimate issue to be determined"). The key question is whether "the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *Submicron*, 432 F.3d at 456.

77. The facts demonstrate Spotswood's and the Debtor's intent to continue treating the loan as a debt following its purchase by Spotswood from Hilltop Energy. When Hilltop Energy approached John Redmond regarding its interest in selling the loan, John Redmond and C.B. Rowan consulted a tax advisor, who told them that the elimination of the loan as a debt obligation would cause the Debtor to incur substantial tax liability for debt forgiveness income. Thus, having the Debtor purchase the loan—or having Spotswood NR II somehow purchase then forgive the loan as a form of equity contribution—would only add to the massive tax bill Spotswood NR II's members were already facing for 2021. Consequently, after careful consideration, they decided that Spotswood would purchase the loan and that the parties would continue to treat it as a debt following the Spotswood Assignment.

78. The Debtor's books and records demonstrate that the Debtor continued treating it

as a loan following the Spotswood Assignment.[82]

79.      Moreover, the documents executed by the Debtor and Spotswood following the Spotswood Assignment evidenced their intent to continue treating the loan as a debt.  After acquiring the loan, Spotswood did not simply waive the prohibition against member distributions under the Initial Loan Agreement without receiving anything in return.  Instead, just as any third-party lender would, it insisted on receiving new consideration by requiring the Debtor to make a prepayment of principal and to grant a security interest on its assets to secure the loan.[83]  All of this was formally documented through the Letter Agreement, the Loan Agreement Amendment, the Security Agreement, and the Deed of Trust executed by the Debtor and Spotswood.

80.      Thus, when looking at the circumstances surrounding the loan, it is clear that the parties intended for the loan to continue being treated as a loan after Hilltop Energy assigned it to Spotswood.  This factor weighs heavily against recharacterization.

### 8)  *"Thin" or adequate capitalization.*

81.      "Thin" or inadequate capitalization is evidence that the advances are capital contributions rather than loans.  *AutoStyle*, 269 F.3d at 751.  Capitalization should be considered at the time the transfer was made.  *Id.*

82.      At the time of the Spotswood Assignment, the Debtor had $3.75 million in cash in the bank after the record revenues it had earned from Uri.[84]  Thus, the Debtor had substantial cash reserves in relation to the amount of the loan.  This factor weighs against recharacterization.

### 9)  *Identity of interest between the creditor and stockholder.*

83.      Contrary to Monarch's assertions in the Motion, the members of Spotswood and

---

[82] **Exhibit 24**.
[83] **Exhibits 17-18**.
[84] **Exhibit 15**.

Spotswood NR II were *not* the same at the time of the Spotswood Assignment.  Though admittedly there was some overlap, the three members of Spotswood NR II—The John and Denise Redmond Living Trust, Doug Redmond, and C.B. Rowan—collectively held only 45% of the membership Series B Units in Spotswood.[85]  And although the Series B Units were unvested for the moment, they would vest only a few months later in December 2021, after which all future distributions would flow to the holders of Series B Units.[86]  The Court cannot simply ignore the fact that the majority of the outstanding Series B Units of Spotswood were held by Spotswood employees with no interest in the Debtor, all of whom would be harmed if Spotswood's debt were recharacterized. This factor weighs against recharacterization.

### 10) Source of interest payments.

84.     The source of payments for both principal and interest is the same: revenues from the Oil and Gas Properties and, in the event of a default or sale, Spotswood's lien on those assets. For the reasons stated above with respect to factor 3 (source of payments), this factor is either neutral or weighs against recharacterization.

### 11) The ability of the corporation to obtain loans from outside lending institutions.

85.     At the time of the Spotswood Assignment, the Debtor almost certainly would have been able to obtain third-party financing.  The Oil and Gas Properties were recently valued at $4.9 million.[87]  The Debtor had just experienced record profits in the previous quarter and had over $3.75 million in cash in the bank.[88]  Thus, the Debtor was in a solid financial position that would have been attractive to outside lenders.  This factor weighs against recharacterization.

### 12) The extent to which the loan was used to acquire capital assets.

---

[85] **Exhibit 1** at Exhibit A.
[86] *Id*. at 8, 18, § 4.4(a).
[87] **Exhibit 14**.
[88] **Exhibit 15**.

86.     Although Hilltop Asset originally extended the loan to finance the Debtor's purchase of the Oil and Gas Properties, the Spotswood Assignment did not generate funds used by the Debtor to purchase capital assets.  Spotswood paid Hilltop Energy for the purchase of the loan. Spotswood did not loan the Debtor any money, and the Debtor did not purchase any capital assets as a consequence of the Spotswood Assignment.  This factor weighs against recharacterization.

**13) *The failure of the debtor to repay on the due date or to seek a postponement.***

87.     Pursuant to the Loan Agreement, the loan was set to mature in 2027.[89]  However, when the Debtor failed to pay the Monarch Judgment (which it had no ability to do), Spotswood accelerated the debt.[90]  The Debtor has not repaid the debt because (i) it has no ability to do so; and (ii) it filed for bankruptcy protection soon after the acceleration.  This factor weighs slightly in favor of recharacterization.

> v.     <u>On balance, there is no valid basis to recharacterize the loan as an equity investment.</u>

88.     The loan should not be recharacterized.  The proper focus of this Court's inquiry is on the inception of the loan when it was made by Hilltop Asset to finance the Debtor's purchase of the Oil and Gas Properties and assigned to Hilltop Energy immediately thereafter.  These related and contemporaneous transactions were governed by New York law, which must be applied under *Lothian Oil* and does not authorize this Court to "look behind" the explicit terms of the loan documents to determine whether or not it was a valid debt.  Rather, New York law requires that the Court honor the plain and unambiguous terms of the parties' agreement as documented in the Initial Loan Agreement and the Note.  And even if were to apply the *Hedged-Investments* factors to the loan at the time of the Spotswood Assignment pursuant to Oklahoma law, every one of those

---

[89] **<u>Exhibit 7</u>** at 1, § 2.1.
[90] **<u>Exhibit 36</u>**.

factors but one—the failure to pay the debt upon acceleration—either weighs against recharacterization or is neutral.

### B. *Equitable Subordination*

#### i.  Standard for equitable subordination

89.     The power of equitable subordination derives from 11 U.S.C. § 510(c), which provides that the court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all to all or part of another allowed claim." Equitable subordination is an "extraordinary remedy, to be sparingly employed." *Equip. Equity*, 491 B.R. at 841 (citing *United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1997); and *Holt v. F.D.I.C. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148-49 (5th Cir. 1989) (equitable subordination is an "unusual" and "extraordinary" remedy)).  Courts should use caution in employing this remedy, which upsets creditors' expectations and can have broader impacts on the cost and availability of credit:

> Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity.  If a court wrongly subordinates a claim, other investors are sure to take heed.  An investor will see that the chance she might not get her money back has gone up slightly.  She will be less willing to lend or invest in the future; and the cost of credit will rise for all.

*In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997); *see also Equip. Equity*, 491 B.R. at 841.

90.     The mere fact that a creditor is an insider is insufficient to merit equitable subordination. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (5th Cir. 1991).  To hold otherwise would "discourage those most interested in a

corporation from attempting to salvage it through an infusion of capital." *In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir. 1977).

91.     The Fifth Circuit applies a three-pronged test to determine whether and to what extent a claim should be equitably subordinated: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Smith v. Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 699 (5th Cir. 1990); *see also Mobile Steel*, 563 F.2d at 699-700.

> ii.     Spotswood and its members did not engage in inequitable conduct.

92.     Courts have found three general categories of inequitable conduct that may warrant equitable subordination: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or alter ego. *Clark Pipe*, 893 F.2d at 699.  None of these circumstances exist in this case.

93.     Monarch's argument focuses primarily on three actions that it alleges amounted to inequitable conduct: (1) amending the Initial Loan Agreement to allow for a distribution of $2,500,000 to Spotswood NR II; (2) obtaining a lien on substantially all of Debtor's assets; and (3) causing the Debtor to default under the Pre-Petition Loan through non-payment to Monarch. Monarch also alleges that the Debtor was undercapitalized, and that Spotswood used the Debtor as its instrumentality or alter ego.  These allegations are either untrue or do not constitute inequitable conduct.

94.     The Debtor's distribution and granting of a lien to Spotswood stem from the Loan Agreement Amendment executed contemporaneously with Spotswood's purchase of the loan from

Hilltop Energy on July 28, 2021.[91] At the time, the Debtor was sitting on $3.75 million in profits earned from Uri in the previous quarter.[92] Because the Debtor and Spotswood NR II are pass-through entities for taxation purposes, Spotswood NR II's members were faced with a very large tax bill for 2021.[93] However, under the Initial Loan Agreement, the Debtor was prohibited from making a distribution to Spotswood NR II to offset the tax liabilities incurred by its members.[94] Thus, Spotswood NR II's members were faced with a substantial tax bill for "phantom income" if Spotswood NR II did not receive a distribution from the Debtor.

95.    So, there was a sound business justification for the Debtor to make a distribution and plenty of funds available to do it. On the other hand, Spotswood NR II's members (The John and Denise Redmond Living Trust, Doug Redmond, and C.B. Rowan) were not the only members of Spotswood. In fact, the three of them held only 45% of the Series B Units of Spotswood and, as managers of that entity, owed duties to Spotswood as well.[95] Therefore, they required that the Debtor receive consideration for waiving Spotswood's right to prohibit distributions in the form of a partial prepayment of principal and a lien on the Oil and Gas Properties.

96.    A creditor's exercise of its contractual rights under a loan agreement does not constitute inequitable conduct. *Clark Pipe*, 893 F.2d at 699-700. Moreover, a creditor's taking a lien from the Debtor to secure its debt, even if the creditor is an insider, does not constitute inequitable conduct. *Fabricators*, 926 F.2d at 1468; *HH Liquidation*, 590 B.R. at 299; *In re Optim Energy, LLC*, 527 B.R. 169, 177 (D. Del. 2015) ("It is not inequitable for a lender, even an insider

---

[91] **Exhibit 18**.
[92] **Exhibits 11 and 15**.
[93] **Exhibit 16**.
[94] **Exhibit 7** at 11-12, § 7.01.
[95] **Exhibit 1** at Exhibit A.

lender, to obtain a lien on the borrower's assets in order to secure its position above creditors in the event of the borrower's default.")

97. Spotswood's members did not act inequitably by authorizing the Debtor to make a distribution (most of which went straight to the IRS) to prevent harm to Spotswood NR II and its members or by causing the Debtor to grant Spotswood a lien. The Debtor was flush with cash and needed to make a distribution to its member to offset the extraordinary income earned from Uri, and granting a lien to Spotswood in consideration for the outflow of funds from the Debtor was a fair exchange and a reasonable exercise of business judgment by the Debtor's management. Moreover, they left a substantial amount of cash in the Debtor's accounts—even after the distribution—which grew to nearly $1.5 million over the next year.[96] Thus, the Debtor was *not* undercapitalized either before or after the distribution, nor did making the distribution or granting the lien harm its creditors, all of which were paid current with the Debtor's funds on hand. If it were inequitable for a company to make a distribution after earning millions of dollars and generating corresponding tax liability to its members, regardless of whether or not the company maintains sufficient cash to meet its ongoing liabilities, then no company could ever make a distribution without it being deemed inequitable.

98. With respect to the Judgment, Spotswood's managers did not manufacture a default by causing the Debtor not to pay it. In reality, the Debtor had no ability to pay Monarch. By the time that the Judgment was entered in March 2024, all of the Debtor's cash reserves had been depleted through the unsuccessful workover operations—which the Debtor had launched in an effort to increase production for both its Monarch's and its own benefit.[97] Gas prices were at

---

[96] **Exhibit 25**.
[97] **Exhibit 34**.

historic lows ($.86/MCF),[98] and it was apparent that the wells would never be able to produce sufficient quantities to meet the MCV requirement. When the Judgment was entered, it became clear that the Debtor had exhausted any legal defenses it had to the enforcement of the MCV requirement and would not be able to pay either the Judgment or the MCV fees going forward. The Debtor's management did not cause the Debtor to default under the Loan Agreement. Entry of the Judgment simply cemented the fact that the Debtor would be unable to meet its obligations to Monarch under the Gas Gathering Agreement.

99. Finally, Spotswood did not use the Debtor as a mere instrumentality or alter ego to benefit itself and its members. A corporation constitutes an instrumentality or alter ego of another when "the dominant corporation has misused the subservient corporation's corporate form by using it for the dominant corporation's own purposes." *Krivo Indus. Supply Co. v. Nat'l Distillers & Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973). This generally occurs where the dominant corporation has caused the subservient corporation to incur liabilities solely for the benefit of dominant corporation, such that "the debts of the subservient corporation are in reality the obligations of the dominant corporation." *Id.* Here, Spotswood did not use the Debtor as an instrumentality to achieve its own purposes, nor did it cause the Debtor to incur liabilities on its behalf. The Debtor's management has always operated with one goal in mind: to generate profits for Spotswood NR II and its members. The Debtor's grant of a lien to Spotswood was consistent with and, in fact, in furtherance of that goal. The lien was a reasonable exchange of value for Spotswood's allowing the Debtor to make a distribution, which prevented the financial hardship (or worse) that would have otherwise been inflicted on Spotswood NR II's members in the absence of any distribution to offset the Debtor's pass-through income. Spotswood did not benefit from

---

[98] **Exhibit 13**.

the distribution; the Debtor and its member did.

100.     Spotswood's and its management's actions do not fall into any of the three categories required to find inequitable conduct.  Therefore, the extreme remedy of equitable subordination is unwarranted and improper.

        iii.     <u>Spotswood's actions did not harm other creditors or confer an unfair advantage</u>.

101.     The Debtor's creditors were not harmed by Spotswood's actions, nor did Spotswood obtain an unfair advantage.  Granting a lien for waiving Spotswood's right to prohibit a distribution was a reasonable exchange of value and did not confer an unfair advantage on Spotswood.  At the time that the Debtor granted the lien and was permitted to make a distribution, the Debtor was well capitalized and paying its debts as they came due.  The Debtor would continue generating substantial cashflow and building up its cash position over the coming year.[99]  The Debtor even put approximately $1.75 million into workover operations in 2022, which, had those been successful, would have resulted in higher production redounding to Monarch's own benefit.  The Debtor's financial troubles were caused by a collapse in gas prices and an unsuccessful and over-budget workover program resulting in lower production levels, not by making a distribution to offset its member's tax liability two and half years before it was forced to seek bankruptcy protection.  *See In re SGK Ventures, LLC*, Nos. 15 C 11224, 15 C 11226, 15 C 11253, 2017 WL 2683686, at *9 (N.D. Ill. June 20, 2017) (actions taken by debtor well before bankruptcy was imminent did not support equitable subordination).  "Hindsight criticism of [the debtor's] business strategy is not the basis for finding inequitable conduct," especially where subsequent, external events have led to the debtor's insolvency.  *Id.*

---

[99] **Exhibit 25**.

> iv.  Even if the Court were to equitably subordinate Spotswood's claim, Spotswood should be treated equally with the Debtor's unsecured creditors.

102.  For the reasons stated above, equitable subordination is not warranted in these circumstances.  However, in the event the that the Court disagrees, Spotswood's claim should not be subordinated to all unsecured creditors.  Equitable subordination is meant to be remedial, not penal, and should only be exercised to the extent necessary to offset the harm caused by the inequitable conduct of the creditor.  *Abatement*, 39 F.3d at 561; *Fabricators*, 926 F.2d at 1464 (affirming bankruptcy court's decision to subordinate secured claim to level of general unsecured creditors rather than below them).  In the unlikely event that the Court decides to subordinate Spotswood's claim, it should be treated equally with all other unsecured creditors.  To hold otherwise would create a windfall for other unsecured creditors—namely, Monarch—by eliminating debt owed by the Debtor well before it was assigned to Spotswood.[100]

### C.  *Spotswood's Poof of Claim should be allowed in full.*

103.  In addition to denying the Motion, the Court should allow Spotswood's proof of claim in full now that it is too late for any other party to object.  In the *Final Order (I) Authorizing the Use of Cash Collateral (II) Providing Adequate Protection, and (III) Modifying the Automatic Stay* [Doc. # 63], the Court established September 12, 2024 (the Challenge Period Termination Date) as the deadline for interested parties to object to Spotswood's prepetition claim against the Debtor.  No party other than Monarch filed a timely objection to Spotswood's Proof of Claim.  Accordingly, the Court should order that Spotswood's Proof of Claim # 9 is allowed in the total

---

[100] Although Monarch's claim is secured for the time being, its judgment lien, which was perfected in the 90 days preceding the petition date, is likely to be avoided as a preference in the pending adversary proceeding filed by the Debtor.

amount of $3,989,132.09, with $3,414,900.00 allowed as secured and $494,232.09 allowed as an unsecured.

## V.    CONCLUSION

Spotswood respectfully requests that the Court enter an order denying Monarch's Motion, allowing Spotswood's Proof of Claim # 9 in the total amount of $3,989,132.09 (with $3,414,900.00 allowed as secured and $494,232.09 allowed as an unsecured), and granting any further relief that is just and proper.

Respectfully submitted,

VELA WOOD STALEY YOUNG, P.C.

By: */s/ Cleveland R. Burke*
Cleveland R. Burke
Texas State Bar No. 24064975
Vela Wood Staley Young, PC
620 Congress Avenue, Suite 320
Austin, Texas 75206
(512) 813-7300
(512) 813-7310 (direct)
cburke@velawood.com

ATTORNEY FOR SPOTSWOOD NATURAL RESOURCES, LLC

## CERTIFICATE OF SERVICE

I hereby certify that, on November 12, 2024, a true and correct copy of the foregoing was filed and served on all parties receiving notice through the Court's CM/ECF system, including counsel below:


WILLIAM E. SPARKS
JONESWALKER LLP
10001 Woodloch Forest Drive, Ste. 350 The
Woodlands, TX 77380
Telephone: (281) 296-4552
wsparks@joneswalker.com
*Counsel for Monarch Resources, LLC*

JOSEPH E. BAIN
ELIZABETH DELEON
JONES WALKER LLP
811 Main Street, Suite 2900
Houston, TX 77002
Telephone: (713) 437-1800
jbain@joneswalker.com
edeleon@joneswalker.com
*Counsel for Monarch Resources, LLC*

Jameson J. Watts
HUSCH BLACKWELL, LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Tel: (512) 472-5456
jameson.watts@huschblackwell.com
*Counsel for the Debtor*

Alejandra Garcia Castro
HUSCH BLACKWELL, LLP
1900 N. Pearl St., Suite 1800
Dallas, Texas 75201
Tel: (214) 981-7053
alejandra.garciacastro@huschblackwell.com
*Counsel for the Debtor*

*/s/ Cleveland R. Burke*
Cleveland R. Burke

## INDEX OF EXHIBITS

| Ex. No. | Description |
|---------|-------------|
| Exhibit 1. | Operating Agreement of Spotswood Natural Resources, LLC date January 1, 2020 |
| Exhibit 2. | Company Agreement of Hilltop SPV, LLC dated September 16, 2020 |
| Exhibit 3. | Combined Resolutions of the Manager and Sole Member of Hilltop SPV, LLC dated April 9, 2024 |
| Exhibit 4. | Operating Agreement of Spotswood NR II, LLC dated September 16, 2020 |
| Exhibit 5. | Assignment, Bill of Sale, & Conveyance dated September 29, 2020 recorded in Leon County, Texas |
| Exhibit 6. | Assignment, Bill of Sale, & Conveyance dated September 29, 2020 recorded in Robertson County, Texas |
| Exhibit 7. | Term Loan Agreement dated September 29, 2020, executed by the Debtor and Hilltop Asset |
| Exhibit 8. | Release of Collateral dated September 29, 2020, executed by Hilltop Asset, Hilltop Energy and Chase Lincoln First Commercial Corporation |
| Exhibit 9. | Assignment and Assumption dated September 29, 2020, executed by Hilltop Asset and Hilltop Energy |
| Exhibit 10. | Term Note dated September 29, 2020 executed by the Debtor to Hilltop Energy |
| Exhibit 11. | Debtor's Income Statement for 2021 |
| Exhibit 12. | Assignment and Assumption Agreement dated July 28, 2021, between Hilltop Energy to Spotswood |
| Exhibit 13. | Summary of gas prices received by the Debtor per month from September 2020 to September 2024. |
| Exhibit 14. | Debtor's PV-10 Valuation on July 1, 2021 |
| Exhibit 15. | Debtor's deposit accounts as of 6/30/2021 |
| Exhibit 16. | Schedule K-1 issued by Debtor to Spotswood |
| Exhibit 17. | Letter Agreement dated July 28, 2021 between Spotswood and the Debtor |

| | |
|---|---|
| Exhibit 18. | Loan Agreement Amendment between the Debtor and Spotswood dated July 28, 2021 |
| Exhibit 19. | Security Agreement between the Debtor and Spotswood dated July 28, 2021 |
| Exhibit 20. | Deed of Trust recorded in Leon County |
| Exhibit 21. | Deed of Trust recorded in Robertson County |
| Exhibit 22. | UCC financing statement filed by Spotswood with the Texas Secretary of State |
| Exhibit 24. | Debtor's year-end Balance Sheet as of December 31, 2021 |
| Exhibit 25. | Bank statements from Debtor's deposit accounts as of November 30, 2022 |
| Exhibit 26. | Debtor's 2022 Income Statement |
| Exhibit 27. | Subordinated Promissory dated April 1, 2023 made by Debtor to JND Opportunities |
| Exhibit 28. | Gas Gathering Agreement dated November 9, 2009 |
| Exhibit 29. | Amendment to Gas Gathering Agreement dated June 26, 2015 |
| Exhibit 30. | Amendment No. 2 to the Gas Gathering Agreement |
| Exhibit 31. | Initial Award |
| Exhibit 32. | Supplemental Award |
| Exhibit 33. | Final Judgment |
| Exhibit 34. | Bank statement for Debtor's deposit accounts as of March 31, 2024 |
| Exhibit 35. | Notice of Default |
| Exhibit 36. | Notice of Acceleration |